**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NEIGHBORHOOD ASSISTANCE CORPORATION OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **CONSUMER FINANCIAL PROTECTION BUREAU**, <br><br> Defendant. | Civil Action No. 11-cv-1312 (RLW) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Neighborhood Assistance Corporation of America ("NACA") claims that the U.S. Department of Housing and Urban Development ("HUD") announced a rule specifically designed to punish NACA for advocacy that has seen the organization at odds with the government.[1]  NACA has asserted Fifth Amendment and Administrative Procedure Act ("APA") claims.  The Bureau moved to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, for summary judgment on the merits.  (Dkt. No. 25).  NACA cross-moved for summary judgment (Dkt. No. 31), and the case is now ripe for a decision.  After careful consideration of the parties' submissions and the administrative record, for the reasons stated below the Court finds that the Bureau's Motion to Dismiss or, in the Alternative, for Summary Judgment (Dkt. No. 25) is denied in part and granted in part, and NACA's Cross-Motion for Summary Judgment (Dkt. No. 31) is denied.

---

[1]      Originally, NACA filed its complaint against HUD only.  (Dkt. No. 1).  It amended to add the Consumer Financial Protection Bureau (the "Bureau") (Dkt. No. 17) and later settled and dismissed its claims against HUD.  (Dkt. No. 22).

**I. Background**

    **A.  The Secure and Fair Enforcement for Mortgage Licensing Act**

    The Housing and Economic Recovery Act was enacted in 2008, primarily to address the subprime mortgage crisis.  See Pub. L. 110-289, 122 Stat. 2654.  As part of that Act, Congress passed the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act"), which encourages States to establish "minimum standards" for residential mortgage loan originators with the goal "to increase uniformity, reduce regulatory burden, enhance consumer protection, and reduce fraud."  12 U.S.C. §§ 5101, 5104(b).  The SAFE Act defines loan originators as those who "take[] a residential mortgage loan application" and "offer[] or negotiate[] terms of a residential mortgage loan for compensation or gain."  See id. § 5102(4)(A).  Congress designed the SAFE Act so that mortgage loan originators "would, to the greatest extent possible, be required to act in the best interests of the consumer."  Id. § 5101(8).  In addition to setting minimum standards for loan originators, the SAFE Act also encourages States, through the through the Conference of State Bank Supervisors ("CSBS") and the American Association of Residential Mortgage Regulators ("AARMR"), to establish a nationwide mortgage licensing system and registry.  Id. § 5101.  Under the SAFE Act, if HUD determined that States failed to implement adequate licensing standards, or if the national registry was not meeting the SAFE Act's requirements, HUD must act as "backup authority" and take action to implement proper procedures.  Id. §§ 5107 & 5108.

    The SAFE Act encourages States to participate in the national registry and implement a system for registering and licensing loan originators, and charged HUD with oversight.  In turn,

CSBS and AARMR developed model legislation to help the States comply with the SAFE Act, and they requested that HUD review a draft.  HUD reviewed the draft legislation and offered comments.  74 Fed. Reg. 312 (Jan. 5, 2009).  Then in December 2009, HUD proposed a set of rules to provide "the procedure that HUD will use to determine whether a State's licensing and registration system is SAFE Act compliant; the actions that HUD will take if HUD determines that a State has not established a SAFE Act-compliant licensing and registration system or that the [national registry] established by CSBS and AARMR is not SAFE Act compliant; the minimum requirements for the administration of the [national registry]; and HUD's enforcement authority if it operates a State licensing system."  (Dkt. No. 27, Administrative Record ("AR") at 7).

## B.  HUD Develops Final Rule on Minimum Licensing Standards Under SAFE Act

The December 2009 proposed rule presents the minimum requirements for a State to comply with the SAFE Act, in part building upon and clarifying its comments from January 2009 regarding the draft legislation from CSBS and AARMR.  The proposed rule states:

> Among the important clarifications that this rule proposes to make are definitions of what activities are included in "tak[ing] a residential mortgage loan application" and "offer[ing] or negotiat[ing] terms of a residential mortgage loan," and what it means to do so "for compensation or gain."  The meanings of these terms largely determine whether or not a particular individual is subject to licensing requirements.  HUD is aware of the great variety of business models that are utilized in the housing finance industry and proposes to provide definitions based on functions, rather than on job titles or labels, to further clarify whether an individual is subject to licensing requirements.  HUD specifically seeks comment on whether the proposed definitions, which are further discussed below, are adequate and appropriate.

(Id. at 9).   In the section "Individuals Not Subject to Licensing Requirements," HUD stated "there are some limited contexts where offering or negotiating residential mortgage loan terms would not make an individual a loan originator."   (Id. at 10).   The proposed rule itself lists seven categories of individuals who would be exempted from the requirement to obtain a loan originator license; it is not in dispute that, in the proposed rule, there is no discussion in this section of an exemption for employees of nonprofits.   (See id. at 16-17 (proposed 24 C.F.R. § 3400.103(e))).   One other part of the proposed rule is particularly relevant here:   HUD noted it views the SAFE Act's phrase "offers or negotiates" broadly, and sought to clarify that the term included "actions by an individual that make a prospective borrower more likely to accept a particular set of loan terms or an offer from a particular lender, where the individual may be influenced by a duty to or incentive from any party other than the borrower."   (Id. at 10).   HUD set February 16, 2010 as the deadline to submit comments on the rule, which it later extended to March 5, 2010.   75 Fed. Reg. 7149 (Feb. 17, 2010).

The day after HUD published the proposed rule in the Federal Register, members of the U.S. House of Representatives introduced a bill to clarify that, under the SAFE Act, States could exempt loan originator employees of 501(c)(3) organizations under certain conditions.   See Nonprofit Mortgage Licensing Clarification Act of 2009, H.R. 4400, 111th Cong. (2009).   The bill garnered 92 co-sponsors, but never passed.   Members of the U.S. Senate introduced the same bill in March 2010, where it eventually garnered nine co-sponsors, but the bill never passed.   See Nonprofit Mortgage Licensing Clarification Act of 2010, S. 3106, 111th Cong. (2010).

HUD received 5,132 comments on the proposed rule regarding the SAFE Act.  (AR at 26).  "An overwhelming majority of the comments received were from individuals, companies, or organizations seeking blanket exemptions from the SAFE Act's licensing requirements."  (Dkt. No. 26, Ex. B at 6).  CSBS and AARMR, the state regulatory groups that drafted the model legislation analyzed by HUD and that were tasked with developing the national registry, commented on whether housing counseling activities of nonprofit organizations should require licensing.  (AR at 60-78).  While unwilling to support a blanket exemption for all nonprofits because of the potential for the abuse of nonprofit status, CSBS and AARMR encouraged HUD to amend the rule to "allow states the discretion to determine when individuals who work for bona fide non-profit community organizations . . . meet the commercial context connotations of the compensation and gain requirement for licensure."  (Id. at 67).  Some of the criteria suggested by CSBS and AARMR to be considered included "whether the organization has a tax exempt status as a charitable organization, such as under Section 501(c)(3)," and whether the organization's compensation structure has commissions or other mechanisms "that incentivizes the employees to steer consumers into certain types of loans or whether employees are compensated on a salary basis."  (Id.).

Many individuals and groups echoed the suggestions of CSBS and AARMR with respect to exempting individuals working for certain nonprofits.  Some, like the New York State Banking Department, did so by explicitly referencing their comments.  (Id. at 83) ("[W]e agree with CSBS and AARMR that states should retain the right to exempt bona fide nonprofit housing counselors from the requirements of the S.A.F.E. Act.").  Others did so by discussing 501(c)(3)

groups explicitly or nonprofits more generally.  For example, Habitat for Humanity and its supporters wrote in to "ask that HUD recognize the legitimate distinction between mortgage transactions entered into by for-profit entities in a general commercial context, and activities conducted by individuals at legitimate nonprofits such as Habitat for Humanity."  (Id. at 112).  Meanwhile, seven prominent consumer groups[2] wrote jointly to "urge HUD to add an exemption for bona fide nonprofit organizations with tax exempt status under 501(c)(3)."  (Id. at 94).  And a number of members of the U.S. House of Representatives wrote in as well making the same point.  (See id. at 113-14, Ltr. of Rep. Barney Frank and Rep. Spencer Bachus; see also id. at 115, Ltr. of Rep. Keith Ellison ("[W]e the undersigned, ask that HUD exempt non-profit housing counselors from the SAFE Act's loan origination licensing requirements").  The administrative record contains other comments requesting an exemption for employees of nonprofit organizations.  (Id. at 80, 85, 94, 121, 122, 126, 130, 133, 139, 141, 145, 150, 166, 168, 171, 172, 175, 181, 182, 187).  NACA submitted comments but did not suggest an exemption for nonprofits from the definition of "loan originator."  (Id. at 116-20).  This is because NACA "concluded that HUD was not contemplating any further limitation on the proposed rule's definition of 'loan originator' and that NACA . . . employees would inevitably be subject to the prospective HUD licensing requirements."  (Dkt. No. 17 at ¶ 59).

HUD took heed of the many comments regarding the proper status of nonprofit entities under the SAFE Act, and changed the proposed rule.  In the final rule, HUD stated that the SAFE

---

[2]     National Consumer Law Center, National Association of Consumer Advocates, National Legal Aid & Defender Association, National Economic Development Advocacy Project, National Association of Consumer Bankruptcy Attorneys, Center for Responsible Lending, and Consumer Federation of America.

Act "does not cover employees of bona fide nonprofit organizations who act as loan originators with respect to residential mortgage loans outside a commercial context" because such employees act "for public or charitable purposes, and not for the profit of another individual or entity." (AR at 24). HUD defined a "bona fide" nonprofit in the Final Rule as one that, among other things, maintains tax-exempt status under section 501(c)(3) of the Internal Revenue Code. (Id.) HUD listed other criteria for a state to consider when determining whether an organization is a bona fide nonprofit in 24 C.F.R. § 3400.103(e)(7), including the organization's purpose, incentive structure, manner of operation, and loan products offered. (See id. at 36).

### C.  Current Status Of Enforcement Of The Final Rule

HUD published the Final Rule on June 30, 2011, announcing August 29, 2011 as the effective date. (Id. at 22). Between these two dates, Congress transferred SAFE Act authority from HUD to the Bureau. See Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. 111-203, § 1100, 124 Stat. 2106 (2010) (codified at 12 U.S.C. § 5301). After the transfer, the Bureau heard concerns from state regulators "about the short amount of time provided for states to ensure compliance with the SAFE Act in light of the final rule" in part "[b]ecause states may need to make legislative or regulatory changes to their respective licensing systems in order to ensure full compliance with the SAFE Act." (Dkt. No. 26, Ex. C). In response, the Bureau decided not to "exercise its authority under the SAFE Act to make determinations that a state does not have in place a system for licensing mortgage loan originators that complies with minimum standards established under the SAFE Act until at least

December 31, 2012." (Id.).  Accordingly, as of the date of this opinion, the Final Rule has not gone into effect.

### D.  This Suit And NACA's Related FOIA Action

NACA "provides mortgage-related housing assistance to low- and moderate-income individuals and communities," and states it is "the largest HUD-certified housing counseling agency in the country, providing approximately 30% of all such housing counseling services." (Dkt. No. 17 at ¶ 2).  The organization is a corporation with tax-exempt status under section 501(c)(4) of the Internal Revenue Code.  (Id.).  NACA filed its original complaint in this action on July 20, 2011 (Dkt. No. 1), and filed its first amended complaint ("Complaint") on August 24, 2011.  (Dkt. No. 17).

In its Complaint, NACA asserts that the government made the above-described change between the proposed and Final Rule—adding an exemption for 501(c)(3) organizations but not for 501(c)(4) ones—specifically to spite NACA because of the organization's tenacious advocacy that has often seen them at odds with the government.  (Id. ¶¶ 10-12).  NACA brings claims against the government under the APA for failing to give proper notice that it might exempt certain nonprofits in the proposed rule, 5 U.S.C. § 706(2)(D), and because the rule's exemption of 501(c)(3) organizations but not 501(c)(4) organizations is arbitrary and capricious. 5 U.S.C. § 706(2)(A).  NACA also states a Fifth Amendment violation because they claim the Bureau's adoption of § 3400.103(e)(7) in the Final Rule "lacks any rational basis and was improperly motivated by personal malice and bad-faith retaliation vis-à-vis NACA."  (Dkt. No. 17 at ¶ 94).  Finally, NACA asks for a permanent injunction of the SAFE Act regulations, and

seeks another round of notice and comment on the exemptions in Section 3400.103(e).   (Id. at 21).

The administrative record filed in this case has never been supplemented, although at one point NACA sought to supplement it.   This Court granted NACA's Motion for Limited Expedited Discovery in part to supplement the administrative record with discovery in advance of a preliminary injunction hearing.  (Dkt. No. 15).  Ultimately NACA withdrew its motion for a preliminary injunction, and only one of the four depositions granted by this Court took place. That deposition has been cited in a related FOIA action before this Court in which NACA seeks documents from HUD that the organization claims have been improperly withheld.   See Neighborhood Assistance Corporation of America v. U.S. Dep't of Housing and Urban Development, No. 11-cv-1175 (D.D.C. filed June 27, 2011), Dkt. No. 8, at 4 ("On or about August 25, 2011, NACA, in the related case referenced above [i.e., this case, No. 11-cv-1312], deposed Michael Motulski ("Mr. Motulski"), the OIG Assistant Regional Inspector General For Audit (Region 1) . . . .").  However NACA never moved to add to the administrative record here. Thus, this Court bases its decision on the original administrative record submitted by the Bureau.

## II.  Motion To Dismiss Under Rule 12(b)(1)

### A.  Legal Standard

The Bureau challenges NACA's standing to bring this suit under Federal Rule of Civil Procedure 12(b)(1).  The Court will address this first because a federal court must determine it has jurisdiction over a case before it can rule on the merits.  Al-Zahrani v. Rodriguez, 669 F.3d 315, 317-18 (D.C. Cir. 2012).  A court has subject matter jurisdiction only when a plaintiff

demonstrates:  (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the challenged action; and (3) a likelihood of redressability.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the Court has jurisdiction.  See Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft, 339 F. Supp. 2d 68, 72 (D.D.C. 2004) (citations omitted).  Under Rule 12(b)(1), the Court may dispose of the motion on the basis of the complaint alone, or it may consider materials beyond the pleadings "as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."  Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citations omitted).  While courts have considerable discretion in handling Rule 12(b)(1) motions, "ordinarily they should be granted sparingly and with caution to make certain that the plaintiff is not improperly denied a right to have his claim adjudicated on the merits."  Charles Alan Wright & Arthur R. Miller, 5B FEDERAL PRACTICE AND PROCEDURE § 1349 at 58 (2004).

### B. Analysis

### 1. "Injury In Fact" Prong

With respect to the injury element of standing, NACA alleges in its Complaint that the Final Rule has "subjected NACA to onerous loan originator licensure requirements—which will cost NACA hundreds of thousands of dollars."  (See Dkt. No. 1 at ¶ 10).  This is in part, NACA claims, because the organization currently has licensure exemptions from states that will be lost because of the rule.  (See Dkt. No. 31, at 33).  By contrast, the Bureau claims that NACA

"cannot point to *any* harm—let alone concrete, imminent harm—that can be traced to the violations of law alleged in its complaint."  (Dkt. No. 25, at 1).

Economic injury can satisfy the "injury in fact" requirement.  <u>Clinton v. City of New York</u>, 524 U.S. 417, 432-33 (1988).  Courts have found standing when an individual or group is likely to suffer an adverse economic impact as a result of agency action.  <u>See, e.g.</u>, <u>Cal. Forestry Ass'n v. Thomas</u>, 936 F. Supp. 13, 17 (D.D.C. 1996) ("Plaintiffs' future economic injury satisfies the injury in-fact requirement.").  This is so even when the economic injury is slight.  <u>See</u> <u>Nat'l Automatic Laundry & Cleaning Council v. Shultz</u>, 443 F.2d 689, 693 (D.C. Cir. 1971).

Here, NACA has sufficiently alleged it will suffer an adverse economic effect to satisfy the injury in fact requirement.  NACA states that implementation of the SAFE Act regulations will remove the exemptions it currently holds from States, and thus the organization would have to incur additional fees.  (Dkt. No. 31, at 33).  NACA provided specific information regarding the additional expenses it would incur in the affidavit of Giovanni Mejia, the organization's in-house counsel, who identified costs associated with applying for, obtaining, and maintaining licenses in various jurisdictions.  (Dkt. No. 31-2, Mejia Aff. ¶¶ 16-20).  As a result of this information, this Court concludes that NACA's increased operating expenses satisfy the injury in fact requirement.

### 2.  "Causal Connection" And "Redressability" Prongs

The Bureau makes essentially three arguments about whether there is a causal connection between the injury alleged by NACA and the conduct of the Bureau, and whether there is a strong likelihood the injury would be redressed by a favorable decision.  First, the Bureau claims

that States had requirements for licensing before the Final Rule, and that NACA "cannot identify a single jurisdiction where" the Final Rule's distinction between 501(c)(3) and 501(c)(4) organizations is the cause for them having to pay for mortgage-originator licenses. (Dkt. No. 25, at 17). Second, the Bureau claims that NACA has incentive compensation practices in place that require their employees to obtain licenses, even if the Final Rule exempted 501(c)(4) organizations. (Id. at 18). And third, the Bureau claims that because States are independent actors, NACA "can do no more than speculate that state legislatures will amend their laws to exempt its employees from licensure if the challenged rule were invalidated." (Id. at 20). The Court takes these arguments in turn.

First, NACA identifies several places where it claims the Final Rule would be the cause of the organization having to pay for licenses. According to NACA, at least Minnesota, Delaware, and the District of Columbia have granted the organization exemptions to their licensing requirements. (Dkt. No. 31, at 34-36). In addition, NACA recently provided supplemental evidence that its employees are conducting mortgage loan origination activities pursuant to the exemptions afforded by those States. (See Dkt. Nos. 38 & 39). The Final Rule requires these States to revoke the exemptions NACA claims it was provided. Because these exemptions will no longer be available, NACA must now obtain loan originator licenses to work in those States. For NACA to demonstrate that their injury is traceable to the Final Rule, they "must make a reasonable showing that but for defendant['s] action the alleged injury will not occur." Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 104 F. Supp. 2d 58, 63 (D.C. Cir. 2000) (internal quotations and citations omitted). Because the Final Rule requires States to

revoke the exemptions NACA states it has, NACA must now obtain loan originator licenses to work in those States.  Thus the Court finds that NACA has identified jurisdictions where the Final Rule's 501(c)(3)/(c)(4) distinction is the cause of their injury.

Second, the Bureau fails to demonstrate that NACA's incentivization structure runs afoul of the Final Rule.  The Final Rule states that a State must determine a nonprofit "[c]ompensates its employees in a manner that does not incentivize employees to act other than in the best interests of its clients."  (AR at 53 (proposed 24 C.F.R. § 3400.103(e)(7)(ii)(E))).  The States will make this determination "under criteria and pursuant to processes established by the state."  (Id. (proposed 24 C.F.R. § 3400.103(e)(ii))).  According to NACA, their compensation structure "operates in the best interest of homeowners."  (Dkt. No. 17 at ¶ 74).  This argument has some force, since the organization currently claims several exemptions from States.  Thus while the Bureau claims to have identified one State that would not allow NACA an exemption because of their compensation structure (something NACA denies (see Dkt. No. 31, at 39 n.13)), this is far from the necessary showing to grant their motion to dismiss.

Third, the issue of whether States act as independent third parties here to defeat standing for NACA raises issues of both traceability and redressability.  The Bureau states that courts have been "loath to find standing" when redress depends on policy decisions to be made by "independent actors not before the courts."  (Dkt No. 25, at 20 (citing U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2010)).  When a plaintiff alleges injury from the government's regulation of a third party, there is a heightened pleading standard with respect to standing.  Lujan, 504 U.S. at 562; Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 336 F.3d

930, 939 (D.C. Cir. 2004) (finding that independent decisions of educational institutions meant that plaintiff could not demonstrate that their alleged injury would be redressed by an invalidation of the challenged policy); Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs., 489 F.3d 1267, 1272 (D.C. Cir. 2007) (finding that independent actions of clinics meant that plaintiff could not demonstrate redressability even if safe harbor at issue was invalidated). However, "an injury worked on one party by another through a third party intermediary may suffice" to establish standing.  Emergency Coal. To Defend Educ. Travel v. U.S. Dep't of Treasury, 498 F. Supp. 2d 150, 159 (D.D.C. 2007) (citations omitted).

    That the Final Rule is directed at States does not defeat NACA's standing to challenge the Bureau regarding its impact.  The States have a different role to play than the independent actors in the cases noted above and relied on by the Bureau.  See also Talenti v. Clinton, 102 F.3d 573, 577 (D.C. Cir. 1996); GrassRoots Recycling Network, Inc. v. U.S. EPA, 429 F.3d 1109, 1112 (D.C. Cir. 2005); La. Envtl. Action Network v. Browner, 87 F.3d 1379, 1383 (D.C. Cir. 1996).  Here the Final Rule would require States to revoke exemptions previously provided to NACA.  Unlike the independent actors in cases like Nat'l Wrestling or Renal Physicians, the States here lack discretion to maintain exemptions previously granted to 501(c)(4) organizations as a result of the Final Rule.  As opposed to the situation in the cases relied on by the Bureau, here NACA's injury is based on the loss of a preexisting benefit that can no longer be conferred.  And the situation here does not depend on future decisions by the States:  they are forced to remove exemptions, thereby causing NACA to incur the cost of loan originator licenses if it wishes to continue its work in the relevant jurisdictions.  Therefore this Court finds that NACA

14

has standing to challenge the Final Rule and will deny the Bureau's motion to dismiss under Rule 12(b)(1).

## III. Summary Judgment

### A. Legal Standard

When ruling on a summary judgment motion in a case involving final review of an agency action under the APA, the standards of Federal Rule of Civil Procedure 56(c) do not apply because of the limited role of the court in reviewing the administrative record.[3]  See Charter Operators of Alaska v. Blank, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012).  Summary judgment serves as a mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review.  See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Cottage Health Sys. v. Sebelius, 631 F. Supp. 2d 80, 90 (D.D.C. 2009) (citation omitted).  The district court must "review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence."  Forsyth Mem'l Hosp., Inc. v. Sebelius, 639 F.3d 534, 537 (D.C. Cir. 2011) (citing Troy Corp. v. Browner, 120 F.3d 277, 281 (D.C. Cir. 1997)).

---

[3]     Local Rule 7(h)(1) requires that a party moving for summary judgment attach a Statement of Undisputed Facts.  In cases where judicial review is based solely on the administrative record, however, a Statement of Undisputed Facts is not required.  LCvR 7(h)(2).

**B. Adequacy Of Notice Challenge To Final Rule**

The parties dispute the adequacy of the notice provided in the proposed rule that there might be additional exemptions to the definition of a "loan originator."  NACA argues that the proposed rule "neither mentioned nor solicited comments about why any nonprofit exemption should be limited, as it was, to organizations that are tax-exempt under Section 501(c)(3) of the Internal Revenue Code, as opposed to tax-exempt organizations described under any other section of the Revenue Code or otherwise recognized by federal law."  (Dkt. No. 31 at 16). Since the proposed rule stated that HUD views the term loan originator "broadly," NACA claims that anticipating the government would narrow the definition was not reasonably foreseeable. (Id. at 17).  The Bureau, by contrast, states that because the proposed rule specifically sought comment on what it means to offer or negotiate a residential mortgage loan "for compensation or gain" so as to "determine whether or not a particular individual is subject to licensing requirements," it provided ample notice about the change made in the Final Rule.  (See Dkt. No. 25 at 2-6; AR at 9).  The Bureau also relies in part on the fact that many comments to the proposed rule addressed exemptions for nonprofit organizations.  (Dkt. No. 25 at 24).

The APA requires that an agency publish notice of its proposed rulemaking with "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3); see also Ariz. Pub. Serv. Co. v. EPA, 211 F.3d 1280, 1299 (D.C. Cir. 2000); Ethyl Corp. v. EPA, 541 F.2d 1, 48 (D.C. Cir. 1976) ("[N]otice should be sufficiently descriptive . . . so that the interested parties may offer informed criticism and comments.").

NACA argues that the proposed rule failed to provide meaningful notice of an intent to adopt any nonprofit exemption to the SAFE Act.  (See Dkt. No. 31, at 15).

The notice and comment process is designed in part to enable agencies to improve their proposals and make changes as necessary.  An agency does not violate the APA's notice and comment requirements simply by virtue of the fact that its final rule differs from its proposed rule.  Nat'l Mining Assoc. v. Mine Safety & Health Admin., 116 F.3d 520, 531 (D.C. Cir. 1997) ("Agencies are not limited to adopting final rules identical to proposed rules.").  And if an agency could not change its proposal based on comments, "an agency could learn from the comments on its proposal only at the peril of subjecting itself to rulemaking without end."  First Am. Disc. Corp. v. Commodity Futures Trading Comm'n, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (internal quotations and citations omitted).  "Instead, renewed notice is required only if the final rule cannot fairly be viewed as a 'logical outgrowth' of the initial proposal."  Id. (quoting Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 547 (D.C. Cir. 1983)).  "[T]he logical outgrowth test normally is applied to consider whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule."  Ariz. Pub. Serv., 211 F.3d at 1299 (internal quotations omitted; emphasis in original) (citing Am. Water Works Ass'n v. EPA, 40 F.3d 1266, 1275 (D.C. Cir. 1994).  "An agency can make even substantial changes from the proposed version, as long as the final changes are in character with the original scheme and a logical outgrowth of the notice and comment."  Natural Res. Def. Council, Inc. v. U.S. EPA, 824 F.2d 1258, 1283 (1st Cir. 1987) (internal quotations and citations omitted).

The Final Rule at issue in this case is a logical outgrowth of the proposed rule.  The proposed rule requested comment on what it means to offer a mortgage loan "for compensation or gain."  As a direct result, interested parties commented on whether an exemption to the SAFE Act should be provided for nonprofit organizations.  NACA states that the proposed rule "is not something that brings visions of new exemptions to the mind of any reasonable reader."  (See Dkt. No. 31, at 19).  This claim asperses a wide range of interested parties who read the proposed rule, saw the possibility of new exemptions, and wrote to the agency requesting them.  See supra Part I.B.  That NACA did not provide a comment advocating for an exemption on its own behalf does not mean that a new round of notice and comment is required.

NACA also takes issue, to no avail, with the Bureau's consideration of and reliance on the comments submitted.  While comments cannot be a substitute for adequate notice, our Circuit has acknowledged that comments may be reflective of adequate notice.  See Horsehead Res. Dev. Co. v. Browner, 16 F.3d 1246, 1268 (D.C. Cir. 1994).  Here the volume and substance of the comments support the Bureau's contention that notice was indeed adequate.  As noted above, many comments sought exemptions for nonprofit organizations, including explicit exemptions for 501(c)(3) organizations.  (AR at 80-187).  These included comments from many of the key actors involved in this area, such as regulators and members of Congress involved in the drafting of the SAFE Act.  Therefore this Court finds no violation of the APA's notice and comment requirements.

### C.  Arbitrary and Capricious Challenge To Final Rule

Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   This standard is "highly deferential" and "presumes the validity of agency action."   AT&T Corp. v. F.C.C., 220 F.3d 607, 616 (D.C. Cir. 2000).   A court should reverse the agency's decision only if it is "not supported by substantial evidence, or the agency has made a clear error in judgment."   Kisser v. Cisneros, 14 F.3d 615, 619 (D.C. Cir. 1994).   "[A] court is not to substitute its judgment for that of the agency," Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43 (1983), and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."   Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

The Bureau established a distinction between the treatment of nonprofits in the Final Rule based on a reasonable interpretation of the SAFE Act.   The Act's licensing requirements apply to those engaged in the business of a mortgage loan originator "for compensation or gain." 12 U.S.C. § 5103(3).   By interpreting this to mean organizations working "exclusively for public, charitable, or family purposes," (AR at 23), the Bureau followed the logic of commenters specific to the proposed rule, as well as the longstanding statutory distinction between nonprofits.   NACA's contention that "the administrative record reflects a complete failure" to explain the distinction between nonprofits ignores the record.   (See Dkt. No. 31, at 25).

The administrative record includes comments that advocate for an exemption for 501(c)(3) groups, but caution against an exemption for nonprofits generally.  As noted above, CSBS and AARMR play a critical role in this area, and their comments therefore carry considerable weight.  While they advocated for the exemption of nonprofits in their joint comments, they did so with an important caveat:  "state regulators recognize the potential for abuse of the non-profit status and do not endorse the adoption of a blanket exemption."  (AR at 67).  The comments of CSBS and AARMR only mentioned an exemption for Section 501(c)(3) organizations, as did others.  (See id.; see also, e.g., AR at 94-95 (comments of National Consumer Law Center et al.)).  NACA claims that 501(c)(4) organizations are "just as public-oriented as their Section 501(c)(3) counterparts."  (Dkt. No. 31, at 29-30).  But this is not necessarily the case, as the Internal Revenue Service itself has noted.  See Internal Revenue Service, Social Welfare:  What Does It Mean?, http://www.irs.gov/pub/irs-tege/eotopicg81.pdf ("One of the major distinctions between section 501(c)(3) and section 501(c)(4) organizations is the amount of activity that may be devoted to non-exempt purposes.").

The U.S. Code's myriad examples of treating 501(c)(3) and 501(c)(4) organizations differently lends additional support to the Bureau's argument.  In turn, were this Court to find that distinguishing between nonprofits based on criteria established in the tax code here was arbitrary and capricious, this would open the door to claims that Congress was arbitrary and capricious in passing the Equal Access to Justice Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Credit Repair Organizations Act, and the Housing and Community Development Act.  (See Dkt. No. 25 at 28-29).  This Court declines to take such an action.

Using a distinction that NACA concedes "may certainly pass the rational basis test governing Congressional legislative distinctions" (see Dkt. No. 31, at 30 n.6) does not suggest that the Bureau acted irrationally while making regulatory distinctions, especially given the wide latitude given to policymakers "in creating classifications and distinctions" based on tax status.  See Regan v. Taxation With Representation of Washington, 461 U.S. 540, 547 (1983).

NACA claims that comments in the administrative record that explicitly discuss the relationship between licensure requirements under the SAFE Act and 501(c)(3) status all "provide the same unreasoned and unexplained conclusion as that adopted by HUD in the Final Rule—that any SAFE Act exemption should be granted to employees of Section 501(c)(3) organizations."  (Dkt. No. 31, at 27 n.4).  NACA asks this Court not merely to find the Bureau's actions as "unreasoned and unexplained," but to find the comments of state regulatory agencies, consumer groups, nonprofit organizations, and members of Congress as "unreasoned and unexplained" as well.  (Id.)  Fundamentally, the problem with this argument is that the course argued for by commenters and ultimately adopted by the Bureau is, as described above, reasoned, explained, and based on the SAFE Act.  Therefore this Court finds that the Bureau's Final Rule is not arbitrary and capricious.

## IV.  Equal Protection Claim

A "class of one" Equal Protection claim is essentially a claim of unfair treatment.  To properly plead a "class of one" Equal Protection claim, a plaintiff must demonstrate they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)

(per curiam); see also Kelley v. District of Columbia, No. 10-2014 (PLF), 2012 WL 4465849, at

*5 (D.D.C. Sept. 28, 2012); Grove, Inc. v. U.S. Dep't of Transp., 578 F. Supp. 2d 37, 48 (D.D.C.

2008).  Both of these two elements, differential treatment and no rational basis, are "essential."

3883 Conn. LLC v. District of Columbia, 336 F.3d 1068, 1075 (D.C. Cir. 2003).  "Even if

subjective ill will is a necessary condition for a class-of-one claim, it is not a sufficient one."

Jicarilla Apache Nation v. Rio Arriba Cnty., 440 F.3d 1202, 1210 (10th Cir. 2006) (emphasis in

original).  The rationality of a government regulation "is accorded a strong presumption of

validity, and the burden is on the one attacking the [governmental] arrangement to negative

every conceivable basis which might support it, whether or not the basis has a foundation in the

record."  Tate v. District of Columbia, 627 F.3d 904, 910 (D.C. Cir. 2010) (internal quotations

and citations omitted).

Since Olech, the U.S. Supreme Court has revisited "class of one" claims only one time, in

a case brought by a government employee alleging wrongful termination.  Engquist v. Or. Dep't

of Agric., 553 U.S. 591 (2008).  Many welcomed a review of Olech in part because of the

concern that the case had opened up the potential for unmeritorious "class of one" claims.  See,

e.g., Robert C. Farrell, The Equal Protection Class of One Claim:  Olech, Engquist, and the

Supreme Court's Misadventure, 61 S.C. L. REV. 107 (2009).  While itself dealing only with the

employment context, Engquist does signal a slight retreat from Olech.  The case notes that

government action often involves "discretionary decisionmaking based on a vast array of

subjective, individualized assessments.  In such cases the rule that people should be 'treated

alike, under like circumstances and conditions' is not violated when one person is treated

differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." Engquist, 553 U.S. at 603.

With that background in mind, this Court now turns to the specific "class of one" claim at issue in this case. First a word on the procedural posture of the claim. The Bureau filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. (Dkt. No. 25). The government moved to dismiss on the standing issue, discussed above, and moved for summary judgment on the merits, including the "class of one" claim. In their opposition, NACA stated that "Defendant's challenge to NACA's Due Process/Equal Protection ('Constitutional') claim must be considered a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6)." (Dkt. No. 31, at 40) (citation omitted). NACA states this is in part because the Bureau has, "among other things, fail[ed] to file a statement of undisputed material facts to which NACA may respond." (Id. at 32 n.7). Because this Court finds the Final Rule satisfies the APA arbitrary and capricious challenge, as discussed below no additional facts are necessary to address the "class of one" challenge. Thus under LCvR 7(h)(2), the "class of one" challenge can be addressed on summary judgment based on the administrative record presented as well.

However the decision would be the same were the Court to decide under Rule 12(b)(6). The reason the decision would be the same is because, as discussed above, the Bureau's Final Rule is not arbitrary and capricious and therefore cannot be said to be irrational. See Tate, 627 F.3d at 910. In this case, the Bureau has supplied several reasons for the Final Rule, including the fact that 501(c)(3) and 501(c)(4) organizations have different statutory rules and are therefore distinguished in many statutes, as well as the fact that many commenters advocated for the

23

exemption that appeared in the Final Rule.   "The task of classifying persons for benefits inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." U.S. R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179 (1980) (internal quotations and citations omitted).   Because the record evinces a rational basis for the rule, and consistent with the developing case law in this area, NACA's "class of one" claim must fail.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment (Dkt. No. 25) is **DENIED IN PART** and **GRANTED IN PART**, and NACA's Cross-Motion for Summary Judgment (Dkt. No. 31) is **DENIED**.   An Order accompanies this Memorandum.


Date: December 3, 2012                    _____
                                          ROBERT L. WILKINS
                                          United States District Judge